HALL *v.* STROM CONSTRUCTION COMPANY.

1. RELEASE—NOMINAL CONSIDERATION—DELAYED SYMPTOMS OF INJURY.

Relief is available to the releasor when he is able to plead and prove that the injury to which the symptoms of delayed disease or disability is provably attributable was mutually unknown when the release he would avoid was signed in return for a nominal consideration, as distinguished from a then want of knowledge of unexpected adverse consequences of a known yet apparently negligible injury.

2. SAME—MUTUAL MISTAKE—SUBSEQUENTLY DEVELOPING EPILEPSY.

Release, obtained some 27 days after accident in consideration of payment of $425, of which $175 was represented as then accrued hospital, medical, and ambulance expenses by releasor for injuries sustained when struck by falling portion of cement block that had been negligently dislodged by defendant construction company's employee, *held*, properly set aside by trial court with reservation of determination at law of question as to whether epilepsy of the grand mal type that subsequently developed was due to brain injury which had been sustained, but not discovered, at time release was given, there having been a mutual mistake entitling plaintiffs to relief.

---

REFERENCES FOR POINTS IN HEADNOTES

[1, 2] 45 Am Jur, Release §§ 20, 50–56.

Appeal from Kent; Hoffius (Stuart), J. Submitted November 9, 1962. (Docket No. 34, Calendar No. 49,440.) Decided December 3, 1962.

Bill by Richard H. Hall and Barbara Ann Hall against Strom Construction Company, a Michigan corporation, and Hardware Mutual Casualty Company, a foreign corporation, to set aside settlement release and enjoin its use as defense in contemplated action for personal injuries claimed subsequently developing from blow on head. Decree for plaintiffs. Defendants appeal. Affirmed.

*Dilley & Dilley (Robert W. Dilley, of counsel), for plaintiffs.*

*Cholette, Perkins & Buchanan (Edward D. Wells, of counsel), for defendants.*

Black, J. The legal background of today's inquiry was painted by Mr. Justice Talbot Smith for the case of *Denton* v. *Utley*, 350 Mich 332, decided in 1957. As in *Denton,* what is written for the case before us must be so limited to the precisionally assembled facts as to unfound fully more of those dolorous jeremiads Justice Smith referred to (*Denton* at 340) as "predictions of business frustration and collapse." Thus may the "modern trend"* of authority be now applied without unduly affecting the valued right of contract by which out-of-court

_____

* "In *Ricketts* v. *Pennsylvania R. Co.* (CCA 2), 153 F2d 757 (164 ALR 387), Judge Frank, in a specially concurring opinion, says (p 767):

"'In all likelihood, it is because the courts have sensed the differentiated character of releases of personal injury claims that the "modern trend" as Wigmore describes it, "is to * * * develop a special doctrine * * * for that class of cases, liberally relieving the party who signed the release." (9 Wigmore, Evidence [3d ed], § 2416, p 55.)'" *Clancy* v. *Pacenti,* 15 Ill App 2d 171, 177 (145 NE2d 802, 71 ALR2d 77, 81).

settlements, of claims for personal injuries, are fairly and understandingly negotiated and effectively completed.

We face here the task of selecting from myriad cases and legal reviews the right rule of law for that instance where the *fact*—not the consequences—of a tortiously caused and ultimately serious internal injury is *existent* but *unknown* when the releasor and releasee of a tort claim agree upon an early acquittance of the latter for a nominal sum. For the questing law reviewer the recent and exhaustive annotation headed "Avoidance of release of personal injury claims on ground of fraud or mistake as to the extent or nature of injuries" (71 ALR2d 82) is of special benefit. For the writing judge it eliminates by way of convenient reference an otherwise indicated need for lengthy citation and quotation. For the lawyer it classifies in meticulous detail what should be examined with utmost care lest the wrong case or line of cases be mistakenly taken as applicable to specially distinguishing facts.

Plaintiff Richard H. Hall was struck on the head and back by a falling portion of cement block which, in the course of work done for defendant Strom Construction Company, was negligently dislodged from above by one of the latter's employees. From that occurrence the trial chancellor proceeds:

"The next thing that Mr. Hall remembered after this accident was when he regained consciousness in the hospital and his wife was next to him in the hospital. He was taken to the hospital on Thursday and was released from the hospital on Sunday. He testified that his back hurt at the belt line and there was a pain at the back of the crown of his head. The doctor treating him was the doctor employed by the Tassell Hardware Company, his employer. He stated that his back was taped and he had gauze on the rear part of his head where he was injured.

"The following Monday after the accident, which occurred on Thursday, he resumed his work at the Tassell Hardware Company. On December 28, 1956, plaintiff Richard H. Hall gave a statement to the adjuster for defendant insurance company. Subsequently, and on January 9, 1957, plaintiffs husband and wife executed a release in the amount of $425 to Strom Construction Company. This release was obtained and executed in the presence of Edward S. Pulaski, an employee of the Hardware Mutual Casualty Company. On the date that he obtained this release, the adjuster called plaintiff Richard H. Hall's physician and asked for the injuries and prognosis. He claimed that he was informed that plaintiff Richard H. Hall had suffered a back injury and a concussion, but had recovered satisfactorily and he saw no permanency to the injuries. At the time of the release, the adjuster testified that he knew of hospital, ambulance and doctor bills in the amount of approximately $175. There was evidence that the words, 'brain concussion and back strain,' are in the hospital record of the confinement of Richard H. Hall. Hall, however, claimed at the trial that he was not aware that he had ever suffered a brain concussion, although he did know that he had a pain at the rear of his head and that a gauze bandage was placed on this portion of the head. At the time the release was obtained, plaintiff Richard H. Hall went to a neighbor's apartment and called his employer, Martin Cook, for advice before signing the papers. Subsequently, and about 1 year after this accident, to-wit, on or about December 13, 1957, while the plaintiff Richard H. Hall was employed as a Yellow Cab driver, he had a blackout and was taken to the hospital. He, subsequently, obtained work in various other types of employment and now claims to be suffering from a form of epilepsy known as the grand mal type."

The instant bill was filed to obtain a decree nullifying the release and enjoining its use as a defense

"in any suit which might be brought by plaintiffs [husband and wife] against defendant Strom Construction Company." The trial chancellor, having alluded to plaintiffs' apparently undisputed testimony that they did not know there had been an internal head injury, that is, an injury to Mr. Hall's brain or concussion thereof, limited his findings to "it is still clear that neither he nor any of the other parties had any knowledge concerning the extent of the injuries," and to "it is clear that none of the persons, that is, plaintiffs, defendant's adjuster or plaintiff's physician, had any thought that there was a permanent injury, if any, to plaintiff Richard H. Hall's brain." He concluded generally that, the amount of consideration paid for the questioned release having been "so small in comparison with the alleged injuries," the release should be set aside "insofar as it covers any alleged injuries to the brain of the plaintiff Richard H. Hall." A decree entered accordingly. This appeal by defendants followed.

Stressed is the fact, a fact we find undisputed upon *de novo* and wholly independent consideration of this equity case, that plaintiffs at release time were without knowledge that Mr. Hall had suffered, distinct from the superficial blow on the back of his head, any kind of a brain injury. By preponderant proof it was shown that they did not even know, as defendants did, that Mr. Hall's medical record at the hospital noted "brain concussion and back strain." They and the insurer were concerned more with the trivial—as it turned out—back injury. All looked upon the head blow as something of but temporary annoyance. Such was the manifest conclusion of plaintiffs' doctor, of the adjuster, and of the defendant insurer's claim office, to which office a copy of the medical record had been sent. Thus a finding of outright want of knowledge, on the part

of the defendant insurer as well as plaintiffs, that Mr. Hall's brain was damaged at the time by the blow to the head, is fully justified. Such specific finding brings into play the line of authorities found commencing on page 100 of the above annotation, subheaded "Requirement of mistake as to existing fact." The essence of such authorities is that relief is available to the releasor when he is able to plead and prove that the *injury*—to which the symptoms of delayed disease or disability is provably attributable—was mutually unknown when the release he would avoid was signed in return for a nominal consideration. Such a case is *Clancy* v. *Pacenti, supra,* where the fact of traumatic herniation of 2 lumbar discs was found mutually unknown at the time of release.

To make the rule pinpoint plain, we construe it as applicable where the releasor's proof persuasively shows a fair and mutual want of knowledge of a hidden injury which eventually comes to consequential light, distinguished from a then want of knowledge of unexpected adverse consequences of a known yet apparently negligible injury. Here, by all fair intendment, Mr. Hall and the adjuster knew that Mr. Hall had been struck injuriously on the head and back. They did not know of the simultaneous internal injury, that is, the brain injury which upon present assumption was serious enough to cause the epileptic seizures Mr. Hall experienced later. The rule therefore applies.

Of all cited authorities the closest in factual and legally acceptable likeness are *Le Francois* v. *Hobart College,* 31 NYS2d 200, affirmed 262 App Div 802 (28 NYS2d 744), and reaffirmed 287 NY 638 (39 NE2d 271), and *Harvey* v. *Georgia,* 148 Misc 633 (266 NYS 168). We adopt both as to reasoning and result; likewise as fairly demarking the line between cases where the specific injury is known and the

consequences thereof are either unknown or un-expected, and cases where the specific causative in-jury (usually internal and difficult of hurried diagnosis) is quite unknown. The following is taken from *Le Francois* (31 NYS2d at 203, 204):

"Defendants' main contention is based upon the premise that plaintiff, having suffered a concussion, must necessarily have sustained a brain injury. This theory is developed from a maze of expert testimony, indicating a fine spun line of demarcation between a brain injury and a concussion of the brain, or to use the scientific term a cerebral concussion. Technically it may be said that any concussion how-ever slight, results in some injury to the brain. However, it seems to me that such a theory is al-together too tenuous. The 2 terms are not entirely synonymous as a matter of practical application, especially from the point of view of a layman. For instance a boxer receives a cerebral concussion when he is 'knocked out.' Consequently it may be said that he has received a brain injury. However, there is no damage to the brain tissues, and shortly he re-covers and is ready to fight again. Such a concus-sion is of a transitory nature, leaving no residual effects.

"Dr. Fred W. Geib, a well known neurologist, dif-ferentiates between the two. He describes a concus-sion as a 'group of symptoms that result when direct trauma is applied to the brain'; and he further testifies, 'a brain injury is a little different, I think, than what we call a cerebral concussion.'

"In any event, the question here is whether this plaintiff, a layman, knew about his injury, and not what the opinion of highly specialized physicians may have been. The courts should attempt to solve pragmatically problems of this character."

As for *Harvey* v. *Georgia,* the following (p 634) was quoted therefrom, as a "significant observation," in *Le Francois* (31 NYS2d at 202):

"The defendants ignore any distinction between the laceration of the tissue outside of the skull and damage to the brain tissue within. The former was known; the latter was not. We think the release was given under mutual, though honest, mistake as to the existence of the latter injury and in ignorance thereof."

We are warned of dire consequences should Judge Hoffius' decree be affirmed. Defendants' counsel say, by way of conclusion of their excellent and helpful brief:

"If this clearly worded release, which the plaintiff read over, understood, and intended to be a complete and final release of their claims against the defendant Strom Construction Company, does not constitute a complete and final release, then we seriously doubt that out of court, amicable, voluntary final settlements and releases can be made. The wording of the release forms cannot be made any stronger and clearer. And it is undisputed the plaintiffs understood it. * * *

"If releases are no longer to enjoy their prior reputation, then in our opinion the only alternative will be to require the taking of consent judgments in the courts.

"Among other things, this can mean delay in paying a claimant much-needed money, may increase the litigation costs of insurance companies, whose costs of course are passed on to the public in increased premiums. It will also mean that claimants must leave their homes and leave their employment to attend a court hearing. And of course it will increase the work of the courts, many of whom are already overburdened."

The portents of Judge Hoffius' decree are not quite that bad. In the first place there is no reasonably assignable need for hurried if not pressured negotiation toward nominal settlements with uninformed laymen. "The sharp economic inequality of

the bargaining parties which generally exists in this class of cases has also been considered by the courts in their consideration of this doctrine." (*Clancy* v. *Pacenti, supra,* 177). Adjusters can wait, surely, until enough time elapses for definite assurance of recovery or, if recovery is uncertain, then until opportunity by observation and treatment provides fair prognostic bases for medical opinions of value. This very case provides an apt illustration. If the defendant insurer's claim office did in fact conclude from the hospital record—as, say, in *Le Francois*— that "brain concussion" might mean brain injury, it could have arranged for that spinal "tap" which, during the trial below, was indisputably testified by a medical witness as being "a valuable diagnostic procedure." That was not done. Instead hasty appraisal and hurried negotiation seem to have been in order. And the very fact of "haste," when coupled with nominal payment, is a potent factor courts take into account when cases like this arrive before them. See *Yehle* v. *New York Central R. Co.,* 267 App Div 301 (46 NYS2d 5), affirmed 295 NY 874 (67 NE2d 516), and *Duch* v. *Giacquinto,* 15 App Div 2d 20 (222 NYS2d 101), and comment therein upon *Le Francois* and like cases.

To recapitulate: This release was obtained for the nominal sum of $425. Of the amount paid $175 was represented by accrued hospital, medical and ambulance expenses. Mr. Hall's injuries were sustained December 13, 1956. The settlement was negotiated and concluded at plaintiffs' home 27 days later. Liability of defendant Strom for the results of whatever injuries Mr. Hall actually suffered was clear so far as the record discloses. Plaintiffs, the negotiating adjuster as well, looked upon the blow to the head as of little or no consequence. All were particularly concerned with the blow to Mr. Hall's back. The blow to the head was apparently severe

·enough to injure the brain and ultimately cause epilepsy, yet neither party was cognizant of the fact of such internal injury. The mistake was mutual within the stated rule; hence, plaintiffs are entitled to the relief granted below.

To make doubly sure that the scope of this opinion is definably understood, we note that no case of unilateral mistake or of fraud is before the Court. See, for appropriate comment, *Denton* v. *Utley, supra,* starting at 339 and concluding on 344; also *Sullivan* v. *Elgin, J. & E. R. Co.,* 331 Ill App 613 (73 NE2d 632).

The circuit court's decree is affirmed, with costs to plaintiffs. By such affirmed decree Judge Hoffius expressly reserved, for determination at law, issue whether the mentioned blow to Mr. Hall's head caused the subsequently developing epilepsy. This reservation was made upon consent of the parties, as we were informed during oral argument of the case.

KELLY, KAVANAGH, SOURIS, OTIS M. SMITH, and ADAMS, JJ., concurred with BLACK, J.

CARR, C. J., and DETHMERS, J., concurred in result.